UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL DOCKET** |
| **VERSUS** | * | **NO. 05-304** |
| **BARRY S. SCHEUR, ET AL.** | * | **SECTION "L" (2)** |

## ORDER & REASONS

Before the Court are Motions by Robert McMillan (Rec. Doc. 99) and Barry S. Scheur (Rec. Doc. 115) to Dismiss All Counts of the Second Superseding Indictment for Failure to State an Offense Against the United States.[1]  The Court heard oral argument and took these motions under advisement.  For the following reasons, the Defendants' motions are now DENIED.

**I.    BACKGROUND**

In November 2005, a grand jury indicted Barry S. Scheur, Robert McMillan, and Rodney Moyer on charges of mail fraud and conspiracy stemming from the failure of The Oath for Louisiana, Inc. ("The Oath"), a health maintenance organization ("HMO").  On February 17, 2006, the grand jury returned a Superseding Indictment adding a new defendant, Danette Bruno, and eleven new counts.  Six months later, on August 11, 2006, the grand jury returned a Second Superseding Indictment for Conspiracy, Mail Fraud, and Wire Fraud.  The Second Superseding Indictment charges one count of conspiracy to commit mail and wire fraud in violation of 18

---

[1] By Order of the Court, the remaining Defendants in this case, Rodney Moyer and Danette Bruno, are deemed to have joined in the instant motions to dismiss.  *See* Rec. Doc. 119.

U.S.C. § 371,[2] five counts of mail fraud in violation of 18 U.S.C. § 1341,[3] and eight counts of wire fraud in violation of 18 U.S.C. § 1343.[4]  In addition, the Second Superseding Indictment includes a Notice of Forfeiture.  A brief review of the facts and allegations is appropriate.

In January 2000, Scheur took control of a Louisiana-licensed HMO called Southeastern

---

[2]  Section 371 provides, in relevant part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371 (2000); *see United States v. Mackay*, 33 F.3d 489 (5th Cir. 1994).

[3]  Section 1341 provides, in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, . . . or knowingly causes to be delivered by mail or such carrier . . . any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341 (2000); *see United States v. Moore*, 37 F.3d 169, 172 (5th Cir. 1994).

[4]  Section 1343 provides, in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343 (2000); *see United States v. Loney*, 959 F.2d 1332, 1337 (5th Cir. 1992).

Medical Alliance and renamed it The Oath for Louisiana, Inc.  Scheur was the owner, president, Chief Executive Officer ("CEO"), and director of The Oath and its parent companies, Venture Health Partnership Group of Louisiana, Inc. and Venture Health Partnership Group, LLC.  Scheur was also the owner, president, and CEO of Scheur Management Group, Inc. ("SMG"), a healthcare consulting business that was allegedly paid between $200,000 and $350,000 per month, for a total of $6.1 million, to manage The Oath.  (Second Superseding Indictment ¶¶ 6 & 9.)  McMillan and Moyer were retained by SMG as consultants to assist in managing The Oath.  Bruno was employed by SMG as its controller.

The Oath received insurance premiums from and on behalf of member individuals and groups ("insureds") and, in turn, paid medical providers such as hospitals and physicians for services provided to the insureds.  Louisiana regulates many aspects of an HMO's operations; for example, state law requires that HMOs file various financial reports and maintain a minimum net worth.  *See* La. Rev. Stat. Ann. § 20:2001 *et seq.*  The Government alleges that beginning at least as early as September 2000 and continuing through at least April 2002, the Defendants "did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and obtain money and property by means of material false and fraudulent pretenses, representations and promises by misleading the Louisiana Department of Insurance ("LDOI") into believing that The Oath was meeting the statutorily required minimum net worth of $3 million, thereby unlawfully enriching themselves through continued operation of The Oath, during a time when The Oath was not meeting that statutorily required minimum net worth."  (Second Superseding Indictment ¶ 19.)  According to the indictment, the Defendants carried out this conspiracy by preparing materially false and misleading financial statements, internal accounting books, and other

3

documents and causing certain of these materials to be filed with the LDOI.  (Second Superseding Indictment ¶ 16.)  Indeed, the Government alleges that The Oath's liabilities exceeded its assets by approximately $45 million in April 2002 when the LDOI placed The Oath in receivership and began liquidation proceedings.  (Second Superseding Indictment ¶ 8.)[5]

## II.     PRESENT MOTIONS

The Defendants move to dismiss all fourteen Counts of the Second Superseding Indictment pursuant to Rule 12(b)(3)(B) of the *Federal Rules of Criminal Procedure* on the grounds that the indictment fails to state offenses against the United States.  The Defendants argue that, according to the indictment, the only alleged victim of the mail and wire fraud was the LDOI.  Accordingly, the Defendants argue that all fourteen Counts must be dismissed because the only property that The Oath could have fraudulently obtained from the LDOI was a license to do business in Louisiana, which is not considered "property" within the purview of the mail and wire fraud statutes.  *See Cleveland v. United States*, 531 U.S. 12 (2000).

The Government argues that the Defendants' reading of the indictment is overly narrow, and that in fact the indictment charges the Defendants with lying to the LDOI, thereby allowing the Defendants to continue to operate The Oath, to collect insurance premiums from the insureds, and ultimately to collect management fees from The Oath all while driving The Oath deep into debt.  The Government argues that the LDOI was not the only victim of the

---

[5] The fallout from the failure of The Oath has been the subject of civil litigation as well. *See Egan Nursing Servs., Inc. v. Scheur*, No. 02-2564 (E.D. La. filed Aug. 16, 2002).  Judge Porteous entered a final judgment dismissing the plaintiffs' claims in May 2003 after granting various dispositive motions several months earlier.  The Orders & Reasons are reported at 2003 U.S. Dist. LEXIS 4860 (E.D. La. Mar. 26, 2003), 2003 U.S. Dist. LEXIS 4855 (E.D. La. Mar. 26, 2003), 2003 U.S. Dist. LEXIS 4845 (E.D. La. Mar. 26, 2003), and 2003 U.S. Dist. LEXIS 4835 (E.D. La. Mar. 26, 2003).

Defendants' scheme, as other businesses and individuals relied on the materially false information provided to the LDOI and suffered economic losses as a result of this reliance.

## III.   LAW & ANALYSIS

Rule 7(c) of the *Federal Rules of Criminal Procedure* requires a "plain, concise, and definite written statement of the essential facts constituting the offense charged." These requirements are essentially the same as those of the Sixth Amendment, which mandates that an indictment must: "(1) enumerate each prima facie element of the charged offense; (2) fairly inform the defendant of the charges filed against him; and (3) provide the defendant with a double jeopardy defense after future prosecutions." *United States v. Gaytan*, 74 F.3d 545, 551 (5th Cir. 1996). An indictment setting forth the offense in the words of the statute itself is generally sufficient, provided that the statue sets forth the essential elements of the offense. *See United States v. Gordon*, 780 F.2d 1165, 1169 (5th Cir. 1986). This is because the indictment's most basic purpose is to fairly inform the defendant of the charge against him. *Id.* Indeed, the "test for validity is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *Id.* When a defendant alleges that an indictment fails to state an offense, the Court must take the indictment's allegations as true. *See United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004) (quoting *United States v. Hogue*, 132 F.3d 1087, 1089 (5th Cir. 1998)).

The indictment in this case, as in *Gordon*, tracks the language of the conspiracy, mail fraud, and wire fraud statutes. Accordingly, on its face, the indictment appears to sufficiently allege fraud and conspiracy. *See Gordon*, 780 F.2d at 1171. However, the Defendants argue that the indictment only alleges fraud on the LDOI and that after *Cleveland v. United States*, 531 U.S.

12 (2000), the Government's theory fails as a matter of law.

In *Cleveland*, the question presented was "whether, for purposes of the federal mail fraud statute, a government regulator parts with 'property' when it issues a license." 531 U.S. at 20. *Cleveland* involved a scheme to obtain video poker licenses from the State of Louisiana by making false statements on license applications. The United States Supreme Court concluded that "§ 1341 requires the object of the fraud to be 'property' in the victim's hands and that a Louisiana video poker license in the State's hands is not 'property' under § 1341." *Id.* at 26-27. This holding applies to the wire fraud statute as well. *See Pasquantino v. United States*, 544 U.S. 349, 355 n.2 (2005).

The United States Court of Appeals for the Fifth Circuit analyzed *Cleveland* several years later in *Christopher v. Miles*, 342 F.3d 378 (5th Cir. 2003). The defendant in *Christopher* was vice president of a holding company that applied to three different state agencies for approval of its proposed acquisition of two insurance companies. In seeking these approvals, the defendant made certain assurances to state regulators that the holding company would not use the assets of the acquired companies to pay for the purchases nor to clear liens on collateral real estate. This in fact happened, however, and the defendants also converted millions of dollars for their own purposes. The Fifth Circuit held that "[u]nlike the defendant in *Cleveland*, who was charged under the wire fraud statutes *solely* with the fraudulent acquisition of regulatory licenses, Christopher was charged with fraud *both* in acquiring the licenses and in looting the insurance companies of their assets." 342 F.3d at 383 (emphasis added); *see United States v. Stewart*, 151 F. Supp. 2d 572 (E.D. Pa. 2001) (upholding conviction where indictment charged the defendant with fraudulently obtaining money and property, including licenses, premiums

from policyholders, and management fees); *United States v. Shelton*, No. 1:00CR127-P-D, 2001 U.S. Dist. LEXIS 24594, at *2-4 (N.D. Miss. July 26, 2001) (refusing to dismiss mail fraud counts where the indictment "plainly charge[d] the defendants with a scheme to fraudulently obtain 'money' from veterans and charities, and the execution of the scheme by filing false monthly bingo financial reports with the State of Mississippi").

The Second Superseding Indictment in this case falls somewhere between *Cleveland* and *Christopher*. The indictment does not specifically allege that the Defendants fraudulently obtained a license to operate The Oath in Louisiana, perhaps in deference to *Cleveland*. However, the indictment also does not specifically allege that the Defendants defrauded or "looted" The Oath, its insureds, or other third parties. *Cf. Christopher*, 342 F.3d at 385 (noting that the indictment made clear that "the 'bottom line' of the scheme was to defraud the insurance companies of their assets").[6]

The Second Superseding Indictment describes The Oath's business and clearly states that it "received insurance premiums from and on behalf of member individuals and groups (known as insureds) and, in turn, paid medical providers such as hospitals and physicians for services provided to the insureds." (Second Superseding Indictment ¶ 1.) The indictment also alleges that The Oath paid SMG approximately $200,000 to $350,000 per month for management services, for a total of $6.1 million, and that in two years the Defendants drove The Oath $45 million into debt. While the indictment does not explicitly state that the insureds and medical providers were defrauded, the Court nevertheless finds that the indictment conforms to minimal

---

[6] Nor does the indictment allege "a scheme to deprive another of the intangible right to honest services" or refer to 18 U.S.C. § 1346. *See United States v. Griffin*, 324 F.3d 330, 355-56 (5th Cir. 2003).

constitutional standards. *See Gordon*, 780 F.2d at 1169. Indeed, all of the facts alleged in the indictment, which the Court must accept as true, lead to the inescapable conclusion that in addition to defrauding the LDOI, the Defendants also defrauded insureds and medical providers of property, namely money. Thus, the Second Superseding Indictment in this case is analogous to those in *Christopher*, *Stewart*, and *Shelton*. *See* supra.

It has been said that "[a] prosecution that relies solely on a theory that the defendant was unjustly enriched by the fraudulent scheme is insufficient to allege a cognizable [mail fraud] offense." Donna M. Maus, Comment, *License Procurement and the Federal Mail Fraud Statute*, 58 U. Chi. L. Rev. 1125, 1138 & n.75 (1991). This is because there must be a "convergence" between the person the defendant intends to deceive and the person wrongly deprived of property. *See United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989) ("[T]he intent must be to obtain money or property from the one who is deceived."); *United States v. Evans*, 844 F.2d 36, 38-40 (2d Cir. 1988) ("The point is not that the defendant must receive the same money or property that the deceived party lost, but only that the party deceived must lose money or property.").[7]

However, the government does not rely solely on a theory of unjust enrichment in this case, as it did in *Cleveland*. The defendants in *Cleveland* fraudulently obtained a license from the government and unjustly enriched themselves by operating video poker machines. The patrons that paid to play video poker were not defrauded; they obtained enjoyment (and perhaps jackpots) in return for their antes. The insureds and medical providers were not so lucky in this

---

[7] Of course, there is no statutory requirement that the defendant make direct misrepresentations to the intended victims of the scheme. *See United States v. Pepper*, 51 F.3d 469, 473 (5th Cir. 1995).

case. Indeed, they were collectively stuck with a $45 million bill after two years of dealing with The Oath.

## IV. CONCLUSION

Accordingly, the Court finds that the Second Superseding Indictment conforms to minimal constitutional standards. Therefore, IT IS ORDERED that the Defendants' motions are DENIED.

New Orleans, Louisiana, this  2nd  day of  January , 2007.

*[signature]*
UNITED STATES DISTRICT JUDGE